UNITED STATES COURT OF APPEALS

FOR THE FIRST CIRCUIT

_____

No. 12-1049

UNITED STATES OF AMERICA,
Appellee,

v.

EVGUENI TETIOUKHINE,
Defendant-Appellant.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

_____

REPLY BRIEF FOR DEFENDANT-APPELLANT

_____

J. Martin Richey
Federal Defender Office
51 Sleeper Street, 5th Floor
Boston, MA 02210

Attorney for Appellant,
EVGUENI TETIOUKHINE

TABLE OF CONTENTS

PAGE

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . .ii

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.   KHRUSHCHEV'S PROPOSED TESTIMONY WAS ADMISSIBLE, AND ITS
     EXCLUSION BY THE DISTRICT COURT WAS REVERSIBLE ERROR . . . 1

     A.   Khrushchev's proposed testimony was admissible under
          Rules 702 and 403 of the Federal Rules of Evidence. . 1

          1.   Khruschev's proposed testimony was helpful, and
               therefore relevant . . . . . . . . . . . . . . . 1

          2.   The relevance of Khrushchev's testimony was not
               substantially outweighed by Rule 403 factors . . 6

     B.   Khruschev was qualified to testify as an expert . . .11

     C.   The error was not harmless. . . . . . . . . . . . . .12

II.  THE IMPEACHMENT OF TETIOUKHINE BY A FIFTEEN YEAR OLD LARCENY
     CONVICTION, AND THE FACTS UNDERLYING THE CONVICTION, WAS
     REVERSIBLE ERROR . . . . . . . . . . . . . . . . . . . . .12

     A.   Tetioukhine did not open the door to impeachment with
          the facts underlying the 1996 larceny conviction. . .12

     B.   Impeachment with the larceny conviction was error . .15

     C.   The facts of the larceny were not admissible under Rule
          608 and the conviction was not admissible under Rule
          609 . . . . . . . . . . . . . . . . . . . . . . . . .15

     D.   The error was not harmless. . . . . . . . . . . . . .18

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . .19

CERTIFICATE OF COMPLIANCE

TABLE OF AUTHORITIES

Cases

PAGE

Bains v. Cambra, 204 F.3d 964 (9th Cir. 2000) . . . . . . . .8, 9

Daubert v. Merrell Dow Pharmaceuticals, Inc. 509 U.S. 579
    (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Jinro America, Inc. v. Secure Investments, Inc., 266 F.3d 993
    (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . .7, 9

Mitchell v. United States, 141 F.3d 8 (1st Cir. 1998) . . . . . 2

Pages-Ramirez v. Ramirez-Gonzalez, 605 F.3d 109
    (1st Cir. 2010) . . . . . . . . . . . . . . . . . . . . 2, 11

United States v. Abdush-Shakur, 465 F.3d 458
    (10th Cir. 2006). . . . . . . . . . . . . . . . . . . . . .10

United States v. Amawi, 695 F.3d 457 (6th Cir. 2012). . . . . .10

United States v. Bahena-Cardenas, 411 F.3d 1067
    (1st Cir. 2008) . . . . . . . . . . . . . . . . . . . . . .10

United States v. Bayard, 642 F.3d 59 (1st Cir. 2011) . . . . . 18

United States v. Cabrera, 222 F.3d 590 (9th Cir. 2000). . . .7, 9

United States v. Giambro, 544 F.3d 26 (1st Cir. 2008) . . . . .11

United States v. Landry, 631 F.3d 597 (1st Cir. 2011) . . .13, 14

United States v. Leake, 642 F.2d 715 (4th Cir. 1981). . . . . .17

United States v. Newman, 849 F.2d 156 (5th Cir. 1988) . . . . .17

United States v. Nguyen, 542 F.3d 275 (1st Cir. 2008) . . . . .16

United States v. Osazuwa, 564 F.3d 1169 (9th Cir. 2009)16, 17, 18

United States v. Rahman, 189 F.3d 88 (2nd Cir. 1999). . . . . .10

United States v. Rubio-Villareal, 927 F.2d 1495
  (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . .10

United States v. Sayakhom, 186 F.3d 928 (9th Cir. 1999) . . . .10

United States v. Sebaggala, 256 F.3d 59 (1st Cir. 2001) . . . . 5

United States v. Shinderman, 515 F.3d 5(1st Cir. 2008). . . . .18

United States v. Sipe, 388 F.3d 471 (5th Cir. 2004) . . . . . .17

United States v. Smith, 80 F.3d 1188 (7th Cir. 1996). . . . . .18

United States v. Tomblin, 46 F.3d 1369 (5th Cir. 1995). . . . .17

United States v. Verduzco, 373 F.3d 1022 (9th Cir. 2004).8, 9, 10

Young v. James Green Management, Inc., 327 F.3d 616
  (7th Cir. 2003) . . . . . . . . . . . . . . . . . . . . .18

Statutes, Regulations and Rules

Fed.R.Evid. 401 . . . . . . . . . . . . . . . . . . . . . . . 1

Fed.R.Evid. 403 . . . . . . . . . . . . . . . . . . . . 1, 6, 8

Fed.R.Evid. 608(b) . . . . . . . . . . . . . . 15, 16, 17, 18

Fed.R.Evid. 609. . . . . . . . . . . . . . . . 15, 16, 17, 18

Fed.R.Evid. 702. . . . . . . . . . . . . . . . . . . . . 1, 5

**ARGUMENT**

**I.    KHRUSHCHEV'S PROPOSED TESTIMONY WAS ADMISSIBLE, AND ITS EXCLUSION BY THE DISTRICT COURT WAS REVERSIBLE ERROR.**

> **A.    Khrushchev's proposed testimony was admissible under <u>Rules 702 and 403 of the Federal Rules of Evidence</u>.**

The government argues that Professor Sergei Khrushchev's proposed testimony was inadmissible under Fed.R.Evid. 702 because it was unhelpful, and inadmissible under Fed.R.Evid. 403 because it was confusing.  G.Br. 13-19.[1]  Both arguments are incorrect.

> **1.    Khruschev's proposed testimony was helpful, and <u>therefore relevant</u>.**

The defense proposed to present testimony from Khrushchev that would emphasize the importance of cultural background on decision making; describe attitudes toward adoption, and explain how American society was portrayed in propaganda broadcast by the United States, in the Soviet Union in the 1980s; and describe certain features of the Russian immigrant community in Rhode Island in the 1990s.

The government claims that the proposed testimony was unhelpful because it was irrelevant.  The standard for determining relevance for expert and non-expert testimony alike, however, is the liberal one set forth in Fed.R.Evid. 401.  <u>See Daubert v. Merrell Dow Pharmaceuticals, Inc.</u> 509 U.S. 579, 587

---

[1]  Tetioukhine's principal brief is cited as "Br." and the government's responding brief is cited as "G.Br."  The addendum to the government's brief is cited as "GA."

1

(1993); <u>Mitchell v. United States</u>, 141 F.3d 8, 14 (1st Cir.
1998).  Thus, in determining whether proposed expert testimony is
relevant:

> the trial court must bear in mind that an expert with
> appropriate credentials and an appropriate foundation for
> the opinion at issue must be permitted to present testimony
> as long as the testimony has a "<u>tendency to make the
> existence of any fact that is of consequence to the
> determination of the action more probable or less probable
> than it would be without the evidence.</u>"

<u>Pages-Ramirez v. Ramirez-Gonzalez</u>, 605 F.3d 109, 115 (1st Cir.
2010)(district court erred in excluding expert testimony
regarding standard of care in obstetrics)(quoting Fed.R.Evid.
401) (emphasis added).

Under this standard, Khrushchev's proposed testimony was
relevant.  As the government acknowledges (G.Br. 14), the sole
issue at trial was Tetioukhine's intent.  Tetioukhine's defense
was that he believed that he had been validly adopted and thereby
given a new identity that he lawfully used; in other words, that
he used the MacEoghan identity without an intent to defraud.  No
fact at trial had greater consequence than whether Tetioukhine
believed as he testified.  As set forth below, and contrary to
the government's assertion (G.Br. 15), defense counsel did
present the court with "concrete reasons" why Khrushchev's
testimony tended to make Tetioukhine's belief that he had been
adopted and given a new identity more probable, and was therefore
relevant.  <u>See</u> <u>also</u> Br. 12.

Khrushchev would have first established that, in order to understand an actor's decision, one must understand the cultural norms which informed that actor's decision making process.  App.I 85-86, 88.  Khrushchev then would have testified about three topics that were relevant to Tetioukhine's belief that he had been adopted, but were beyond the experience of the average American juror.

First, adoption in the Soviet Union was highly stigmatized. As a consequence, adopted individuals assumed different identities, which might include claiming a different date and place of birth, to hide the fact of adoption.  App.I 64, 92. This proposed testimony was directly relevant to whether Tetioukhine believed that he was adopted by McCoon, given a new identity, and therefore validly claimed, for example, that he was born in Dublin in 1969 rather than in Sverdlovsk in 1971.  That Khrushchev's proposed testimony about Soviet adoption practices concerned child adoptions rather than adult adoptions does not, as the government suggests (G.Br. 15), render the testimony irrelevant.  As argued in Tetioukhine's principal brief, there was no evidence that Tetiouklhine himself knew of any distinction between "child" and "adult" adoption, or that such a distinction was drawn in the Soviet Union.  Br. 23.

Second, Khrushchev would have testified that within the Russian[2] immigrant community in Rhode Island, a network of support was available to, for example, help recent immigrants "do basic things like getting a Social Security card[.]"  App.I 64, 93.[3]  This subject area was not "removed from the core defense," as the government argues (G.Br. 16), but was instead central to it.  Tetioukhine testified that he received his Social Security card from McCoon.  Absent a familiarity with the manner in which recent immigrants relied on others to help them obtain such paperwork, the average juror would be suspicious of this transfer, and think that Tetioukhine should have been suspicious about the card's legitimacy.  Khrushchev's proposed testimony would have been far more specific than the general notion that (in the words of the district court) "as has been true of every immigrant community here in the United States from time immemorial, people gravitate to their own countrymen for assistance when they get here."  App.I 98; see also G.Br. 16. For this reason the proposed testimony was not about something

---

[2]  While defense counsel's letter of August 1, 2011 stated that Khrushchev would testify specifically about the Russian *Jewish* immigrant community (App.I 64), during her proffer counsel said that Khrushchev would testify about the Russian immigrant community generally.  App.I 93.

[3]  To the extent the government is suggesting that counsel did not address Khrushchev's qualifications to testify about the experience of immigrant Russians in Rhode Island in the 1990's (G.Br. 12), that suggestion is erroneous.  See App.I 93.

within the common experience of jurors, but would instead have imparted "specialized knowledge [that would have helped] the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702(a).

Third, Khrushchev would have testified that American propaganda broadcast in the Soviet Union portrayed the United States as a society lacking rigorous bureaucratic controls where foreigners were freely welcomed. App.I 79, 93, 98. This testimony was directly relevant to whether Tetioukhine believed he could be adopted in the informal way McCoon proposed, that citizenship could so easily be conferred upon him, and that government documents such as Social Security cards could be so readily obtained.

In sum, context is important, and Khrushchev's testimony was relevant because it would have given crucial context to the jury for its assessment of whether Tetioukhine believed, as he testified, that he was adopted by McCoon and given a new identity.

The relevance of Khrushchev's testimony, as just described, distinguishes this case from United States v. Sebaggala, 256 F.3d 59 (1st Cir. 2001). There, a Ugandan national was charged with, among other things, making false statements on United States customs forms. He sought to call an expert on the linguistic and cultural traits of his native Baganda tribe to assist the jury in

5

assessing his ability to understand the forms that he signed.[4]
Id. at 65.  This Court affirmed the district court's exclusion of
the evidence, saying that testimony concerning linguistic
aptitude was unnecessary.  The jury did not need expert testimony
for the common sense proposition that "an individual whose
primary language is other than English might have difficulty
comprehending bureaucratic forms."[5]  Id. at 66.

Here, Tetioukhine's claim was not that he had difficulty
understanding any forms that he submitted, but rather that he
believed that he had been legitimately adopted by McCoon and
given a new identity.  Khrushchev's testimony was relevant to the
jury understanding why that was so.

2.   The relevance of Khrushchev's testimony was not
     substantially outweighed by Rule 403 factors.

The government argues that the relevance of Khrushchev's
testimony was substantially outweighed by a danger that it would
confuse and mislead the jury, cause unfair prejudice, and unduly
prolong the trial.  G.Br. 16-17.  This argument fails, first
because it flows from an erroneous characterization of the

---

[4]  It should be noted that the defendant's background
included the facts that he was the mayor of Kampala, owned a
successful currency exchange bureau, was a frequent visitor to
the United States, and had opened a bank account in
Massachusetts.  Id. at 62.

[5]  This Court also found that proffered testimony concerning
tribal forms of non-verbal communication was totally irrelevant
since no such communications were used by the defendant.  Id. at
66.

testimony as having only "tenuous relevance or [a] modest ability to help the jury[.]" G.Br. 16.  As argued above, the testimony was highly relevant to Tetioukhine's belief that he had been adopted and given a new identity by McCoon.  Moreover, the government offers no tangible reason why Khrushchev's testimony would confuse or mislead the jury (or why his appearance as a witness would precipitate a "mini-trial on Russian culture or history"), except to assert that defense counsel's proffers were hard to understand and that the import of the testimony eluded the district court.  Id.  A better reading of the hearing transcript is that the court was unduly dismissive of the proffered evidence.  In the end, defense counsel articulated the sum and substance of Khrushchev's testimony as set forth above, and there was nothing confusing or misleading about it.

As it did below, see App.I 70-71, the government equates Khrushchev's proposed testimony with "cultural stereotyping," and argues it was properly excluded on that basis.  G.Br. 18-19.

Courts have excluded expert testimony that amounts to cultural stereotyping.[6]  For example in United States v.

---

[6]  The prohibition against "cultural stereotyping" derives from the principle, rooted in due process and equal protection, that a case may not be decided on appeals to prejudice.  See Jinro America, Inc. v. Secure Investments, Inc., 266 F.3d 993, 1006-08 (9th Cir. 2001) (reversing grant of summary judgment predicated on hearing where expert was permitted to "generalize that most Korean businesses are corrupt . . . , inviting the jury to assume the Korean litigant fits the stereotype"); United States v. Cabrera, 222 F.3d 590, 594 (9th Cir. 2000)(reversing

<u>Verduzco</u>, 373 F.3d 1022 (9th Cir. 2004), cited by the government
(G.Br. 18), the defendant (a Mexican-born American citizen living
in Los Angeles) was arrested attempting to smuggle marijuana into
the United States at San Ysidro, California.  He raised a duress
defense, claiming that while he was in Mexico several days prior
to the smuggling attempt, he had been threatened by Mexican drug
traffickers and forced to smuggle the marijuana.  <u>Id.</u> at 1025.  A
central issue at trial became whether, given the time lapse
between the threat and the attempted smuggling (and the fact that
during that time frame the defendant made a return trip to Los
Angeles), the defendant could have escaped the harm by reporting
the threat to the police.  <u>Id.</u> at 1030.  On this point, the
defendant sought to call an expert to testify that Mexicans are
reluctant to approach local law enforcement because of its
corrupt ties to the violent Tijuana drug cartels.

    The district court excluded the testimony on grounds
including:  (1) Rule 403, because the defendant actually
testified that he distrusted the Mexican police, not because of
any link to violent drug cartels, but because they had previously
stopped him and asked for money, <u>id.</u> at 1032-33; and (2) tenuous

---

drug convictions where detective made repeated references to
defendants' Cuban origin and generalizations about the Cuban
community); <u>Bains v. Cambra</u>, 204 F.3d 964, 974-75 (9th Cir. 2000)
(holding prosecutor committed error in closing argument by
suggesting that Sikhs had a tendency to violence and
retribution).

relevance, where the defendant "had graduated from a United States high school, had lived in the United States for at least two years prior to the arrest, spoke English, had a sister caring for him in the United States, and worked for a United States corporation."[7]  Id. at 1033.

In affirming the exclusion of the testimony, the Ninth Circuit said that the district court had been "understandably 'chary' of 'cultural stereotyping' testimony," citing cases such as Jinro, Cabrera and Bains, supra n.6.  The court held that on the particular facts presented, the district court did not abuse its discretion "by excluding testimony that sought to establish the reasonableness of Verduzco's alleged belief solely by the application of generic cultural and ethnic stereotypes and data." 373 F.3d at 1034 (emphasis added).

Verduzco is readily distinguishable.  There, the defendant's own testimony (that he distrusted police because they had asked him for money) contradicted the generalization that he sought to present through expert testimony (Mexicans distrust police because the police are aligned with drug cartels).

More fundamentally, the evidence proffered here was not cultural stereotyping.  It did not comprise generalizations that Soviets behaved in a certain way.  Rather, Khrushchev would have

---

[7]  As to relevance, the court notably stated that the testimony might be helpful had the defendant not been a citizen of, and educated in, the United States.  Id.

testified to historical facts:  (1) adoption was stigmatized in
the Soviet Union, and as a consequence steps were sometimes taken
to hide it; (2) a community of support was available to help
recent Russian immigrants obtain official paperwork such as
Social Security cards; and (3) American propaganda in the late
Soviet era portrayed the United States as a welcoming society
with little bureaucracy.  These facts do not stereotype, or
appeal to prejudice.[8]

Finally, a primary purpose of presenting Khrushchev was to
*prevent* stereotyping by emphasizing that one's actions are
informed by one's background, and explaining certain features of

_____

[8] Other cases cited by the government for the proposition
that the exclusion of culture evidence is "routinely" affirmed
(G.Br. 17-18) are distinguishable.  In most of the cases, the
evidence was excluded primarily because it was irrelevant to the
defense of the charges at issue in those cases.  For example, in
United States v. Abdush-Shakur, 465 F.3d 458, 466-67 (10th Cir.
2006), expert testimony on prison culture to establish motive was
deemed irrelevant because the fact that the defendant may have
had a motive was not a defense to the crime charged (assault of
prison guard with intent to murder).  Similarly, in United States
v. Amawi, 695 F.3d 457,480 (6th Cir. 2012) and United States v.
Rahman, 189 F.3d 88, 135-36 (2nd Cir. 1999), the proffered expert
testimony was deemed irrelevant to the charges at issue in those
cases.  The expert evidence in United States v. Bahena-Cardenas,
411 F.3d 1067, 1078 (1st Cir. 2008) was excluded for lack of
sufficient foundation where it sought to extrapolate broadly on
the basis of a study involving 56 people, only five or six of
whom reported the relevant trait.  The affirmances in United
States v. Sayakhom, 186 F.3d 928, 936 (9th Cir. 1999) and United
States v. Rubio-Villareal, 927 F.2d 1495, 1502 & n.6 (9th Cir.
1991) were without extended discussion, but the evidence at issue
was similar to the type excluded in Verduzco and could be
considered stereotyping evidence.

Soviet, and Russian immigrant, background to which the average juror would not otherwise have access.

  B. <u>Khruschev was qualified to testify as an expert</u>.

  The government concedes that Khrushchev was qualified to testify "about Soviet history and culture writ large" (G.Br. 20), but then argues that he was not qualified and lacked sufficient data to testify as an expert in the specific areas proposed. G.Br. 20-21.  It is precisely Khrushchev's conceded knowledge of Soviet history and culture generally, however, that qualified him to testify about such prominent characteristics of Soviet society as the prevailing norms surrounding adoption and the content of American propaganda.  Khrushchev's proposed testimony was not "anecdotal" in the sense used in <u>United States v. Giambro</u>, 544 F.3d 26 (1st Cir. 2008) (proposed expert's conclusion that firearms registry contained inaccurate and incomplete data was based on, among other things, experience of two gun owners). G.Br. 21.

  As for Khrushchev's proposed testimony on characteristics of the Russian immigrant community in Providence in the early 1990s, his experience as a Russian immigrant to Providence in that time frame gave him all the specialized knowledge required.  <u>See</u> App.III 64-65, 93; <u>Pages-Ramirez v. Ramirez-Gonzalez</u>, 605 F.3d at 115 (unduly restrictive view of relevant expertise "is

incompatible with what we have characterized as a liberal
standard of relevance.").

     C.   <u>The error was not harmless</u>.

    The erroneous exclusion of Khrushchev's testimony was not
harmless because the testimony would have provided context that
was critical to the jury's assessment of Tetioukhine's testimony
that he believed he had been adopted and given a new identity,
and so used that identity without an intent to defraud.  Without
Khrushchev's testimony, Tetioukhine's defense was far less
plausible.  Contrary to the government's argument (G.Br. 23),
Khrushchev's testimony would have provided strong support for the
defense such that it is highly probable that the outcome would
have been different.  Tetioukhine's own testimony, and the brief
remarks of Alex Vilner (G.Br. 24), were no substitute for the
full range of information Tetioukhine sought to introduce through
Khrushchev.

**II.  THE IMPEACHMENT OF TETIOUKHINE WITH A FIFTEEN YEAR OLD
     LARCENY CONVICTION, AND THE FACTS UNDERLYING THE CONVICTION,
     WAS REVERSIBLE ERROR.**

     A.   Tetioukhine did not open the door to impeachment with
         <u>the facts underlying the 1996 larceny conviction</u>.

    The government argues that Tetioukhine opened the door to
impeachment with the facts underlying the 1996 larceny in a
building conviction by (1) broadly portraying himself as a law-
abiding citizen, and (2) more narrowly, suggesting that he

"merely left the jewelry job because he found another job he liked better."  G.Br. 30.  Neither contention is correct.

As to the latter ground, the testimony was as follows:

**Q.**  Did you come to get a job?

**A.**  Yes, I did.

**Q.**  What did you do?

**A.**  I started working for the jewelry company doing white casting.

**Q.**  And how long did that last for?

**A.**  As far as I recall, roughly about four to five months.

**Q.**  And at some point did you get a different job?

**A.**  Yes, I did.

**Q.**  And how did you find that job?

**A.**  I started looking around for a new job, and I found an inventory job which I liked.

Add.III 52.

This exchange presented no impression, good or bad, regarding why Tetioukhine left the jewelry job.  It established neutrally the bare facts that Tetioukhine worked for the jewelry company and then worked somewhere else.  Those facts did not open the door to impeachment by contradiction:  the jury was not left with any false impression to be contradicted.  For that reason this case is distinguishable from United States v. Landry, 631 F.3d 597, 604-05 (1st Cir. 2011) (impeachment by conviction of drunk driving permitted where conviction led to termination of

13

employment from MBNA, and defendant's testimony "created a false
impression that made the circumstances of her termination
relevant for questioning.").[9]

Nor did Tetioukhine's testimony viewed broadly open the door
to impeachment by facts of the larceny.  The government does not
claim that Tetioukhine actually testified that he "wanted to
follow the law," as the district court erroneously found.
App.III 101; Br. 29-31; G.Br. 30.  Rather, the government argues
that the "gist" of the testimony is that Tetioukhine tried to
present himself as a law-abiding citizen.  That is a skewed view
of the testimony.  Tetioukhine's defense was not that he always
obeyed the law and therefore must have done so here.  Instead his
defense was that he believed he had been adopted and so believed
he legitimately used the MacEoghan identity; his testimony,
including those portions cited by the government, was comprised
of facts germane to the charges and that defense.  For example,
testimony that Tetioukhine lived, worked, studied, held a bank
account, obtained and paid a mortgage, and traveled, all openly
under the name MacEoghan (App.III 11, 20, 61-62, 71-72, 79, 83,

---

[9] The testimony about employment in <u>Landry</u> was especially
relevant where the defendant was charged with identity theft and
had worked at MBNA and another company where she was given access
to customer account information, including personal identifiers.
<u>Id.</u> at 599-600.  Representatives from both companies testified
about the defendant's access to such information at trial.  <u>Id.</u>
at 600. In contrast, Tetioukhine's employment at the jewelry
company was comparatively insignificant.

85, 87, 95-96), was elicited to demonstrate that he believed he had been adopted and his name lawfully changed to MacEoghan.  It was not elicited for the proposition that he always followed the law.  <u>See</u> App.III 228-29, 235 (closing argument).

    B.   <u>Impeachment with the larceny conviction was error</u>.

Because Tetioukhine did not open the door, the questioning of him about the larceny was error.  In the alternative, as argued in Tetioukhine's principal brief (Br. 31-32), the prosecutor was allowed to go too far and the questioning should have stopped once Tetioukhine admitted the theft.  For either reason, Tetioukhine's incorrect response that the matter never went to court was improperly solicited, and the subsequent impeachment with the larceny in a building conviction was error.

    C.   The facts of the larceny were not admissible under Rule 608 and the conviction was not admissible under Rule 609.

The government argues that the facts of the larceny were independently admissible as impeachment of Tetioukhine under Fed.R.Evid. 608(b) (G.Br. 33-35), and appears to argue the conviction was independently admissible under Fed.R.Evid. 609 (G.Br. 34 n.3).  Both arguments are incorrect.

To begin, the government's characterization of the theft as "akin to embezzlement" (G.Br. 33) is exaggerated.  The investigation report appended to the government's brief alleges that Tetioukhine was caught trying to leave the factory with a

15

three-gram piece of gold hidden in his pocket, and that he
admitted to having stolen six or seven other pieces over a few-
week period by hiding them in his mouth.  GA 13, 16.  According
to court records, the amount of restitution ordered was $500.00
GA 11.  The larceny here was more akin to shoplifting than
"embezzlement" (G.Br. 33).

     With respect to Rule 609, the government relegates to a
footnote (G.Br. 34 n.3), and even there does not attempt to
distinguish, this Court's decision in United States v. Nguyen,
542 F.3d 275 (1st Cir. 2008), where this Court applied the strict
requirements of Fed.R.Evid. 609(b) to affirm a decision to
prohibit impeachment with a stale felony conviction for auto
entry (a property crime, as here).  See Br. 33-34.  Applying
Nguyen, Tetioukhine's larceny conviction was inadmissible under
Rule 609(b).

     With respect to Rule 608, the government does not even
address, much less respond to, Tetioukhine's primary argument,
adopted in United States v. Osazuwa, 564 F.3d 1169, 1173-75 (9th
Cir. 2009), that because the larceny in a building conviction was
inadmissible under Rule 609, the facts underlying the conviction
were not admissible through the back door of Rule 608(b).  Br.
34-35.  The cases cited by the government (G.Br. 33-34) were all
decided before, and so do not address, the holding of Osazuwa.

16

Moreover, the decisions in <u>United States v. Sipe</u>, 388 F.3d 471, 485-86 & n.40 (5th Cir. 2004) and <u>United States v. Tomblin</u>, 46 F.3d 1369, 1388 (5th Cir. 1995) (G.Br. 33-34) do not support the government's argument that the facts underlying the larceny conviction were admissible under Rule 608(b).  In <u>Sipe</u>, the court stated in dicta that a theft conviction "might conceivably" be admissible under Rule 608(b), citing <u>United States v. Newman</u>, 849 F.2d 156, 163 (5th Cir. 1988).  In <u>Newman</u>, the court said that theft offenses containing an element of deceit are admissible under Rule 609(a)(2).  As argued in appellant's principal brief (Br. 32 n.8), the Massachusetts offense of larceny in a building does not require proof of a dishonest act or false statement, and thus the conviction was not admissible under Rule 609(a)(2). <u>Sipe</u>, in fact, is consistent with the outcome in <u>Osazuwa</u>.

In <u>Tomblin</u>, 46 F.3d 1369, 1388 (5th Cir. 1995), the court affirmed the impeachment of the defendant under Rule 608(b) with instances of bribery, bankruptcy fraud and embezzlement, citing <u>United States v. Leake</u>, 642 F.2d 715, 718 (4th Cir. 1981). <u>Leake</u>, like <u>Newman</u>, permits impeachment with theft offenses only where they are "'clearly probative of truthfulness or untruthfulness,' such as perjury, fraud, swindling, forgery, bribery, and embezzlement."  In this way <u>Tomblin</u>, like <u>Sipe</u>, is consistent with <u>Osazuwa</u> and does not support the government's

17

argument that the facts of the larceny were admissible under Rule 608(b).

The Seventh Circuit does permit impeachment under Rule 608(b) with facts of theft or stealing.  See Young v. James Green Management, Inc., 327 F.3d 616, 626-27 (7th Cir. 2003); United States v. Smith, 80 F.3d 1188, 1193 (7th Cir. 1996).  Br. 35; G.Br. 33-34.  This Court is not bound by the Seventh Circuit's position, and should not adopt it for the reasons given in Osazuwa.[10]

Neither the facts underlying the larceny in a building conviction, nor the conviction itself, were admissible under Fed.R.Evid. 608 and 609.

D.    The error was not harmless.

The admission of the larceny in a building conviction and the facts underlying the conviction were not harmless. Tetioukhine's defense rested on his credibility.  The evidence of the larceny in a building conviction and the facts underlying the conviction provided a basis for significantly undermining that credibility.

---

[10]  The government cites two of this Court's cases for the general proposition that Rule 608 permits impeachment with specific instances of a witness's conduct.  G.Br. 33.  Neither case addresses the issue presented here.  The defendant in United States v. Bayard, 642 F.3d 59, 62-63 (1st Cir. 2011) waived any Rule 608(b) argument and so the Court did not address the scope of the rule.  In United States v. Shinderman, 515 F.3d 5, 16-17 (1st Cir. 2008), the defendant was impeached with prior instances of lying, not theft.

**CONCLUSION**

For the reasons argued above and in Tetioukhine's principal brief, the convictions and sentence should be vacated, and the case remanded for a new trial.

EVGUENI TETIOUKHINE
By his attorney,


/s/ J. Martin Richey
J. Martin Richey
  U.S.C.A #46498
Federal Defender Office
51 Sleeper Street, 5th Floor
Boston, MA 02210
Tel: 617-223-8061


CERTIFICATE OF SERVICE

I, J. Martin Richey, hereby certify this document filed through the ECF system will be sent electronically to Assistant U.S. Attorney Donald C. Lockhart as identified on the Notice of Electronic Filing on January 28, 2013.

/s/ J. Martin Richey
J. Martin Richey

19

# Certificate of Compliance With Rule 32(a)

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

☐  this brief contains _____ words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

☑  this brief uses a monospaced typeface and contains __518__ lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

☐  this brief has been prepared in a proportionally spaced typeface using _____ _____ in _____, *or*

☑  this brief has been prepared in a monospaced typeface using _____ __Courier New font in WP X6_____ with _no more than 10.5 characters/inch_.

(s) _/s/ J. Martin Richey_____

Attorney for _Appellant_____

Dated: _01/28/2013_____